PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 15-2206, 15-2217, 15-2230, 15-2234, 15-2272, 15-2273
15-2290, 15-2291, 15-2292, 15-2294, 15-2304 & 15-2305
_____

IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS
CONCUSSION INJURY LITIGATION

Craig Heimburger; Dawn Heimburger,
                                    Appellants (15-2206)

Cleo Miller; Judson Flint; Elmer Underwood; Vincent
Clark, Sr.; Ken Jones; Fred Smerlas; Jim Rourke; Lou
Piccone; James David Wilkins, II,
                                    Appellants (15-2217)

Curtis L. Anderson,
                                    Appellant (15-2230)

Darren R. Carrington,
                                    Appellant (15-2234)

Raymond Armstrong; Nathaniel Newton, Jr.; Larry
Brown; Kenneth Davis; Michael McGruder; Clifton L.
Odom; George Teague; Drew Coleman; Dennis
DeVaughn; Alvin Harper; Ernest Jones; Michael
Kiselak; Jeremy Loyd; Gary Wayne Lewis; Lorenzo
Lynch; Hurles Scales, Jr.; Gregory Evans; David

Mims; Evan Ogelsby; Phillip E. Epps; Charles L. Haley, Sr.; Kevin Rey Smith; Darryl Gerard Lewis; Curtis Bernard Wilson; Kelvin Mack Edwards, Sr.; Dwayne Levels; Solomon Page; Tim McKyer; Larry Barnes; James Garth Jax; William B. Duff; Mary Hughes; Barbara Scheer,

                                        Appellants (15-2272)

Liyongo Patrise Alexander; Charlie Anderson; Charles E. Arbuckle;  Cassandra Bailey, as Representative of the Estate of Johnny Bailey; Ben Bronson; Curtis Ceaser, Jr.; Larry Centers; Darrell Colbert; Harry Colon; Christopher Crooms; Jerry W. Davis; Tim Denton; Michael Dumas; Corris Ervin; Doak Field; Baldwin Malcolm Frank; Derrick Frazier; Murray E. Garrett; Clyde P. Glosson; Roderick W. Harris; Wilmer K. Hicks, Jr.; Patrick Jackson; Gary Jones; Ryan McCoy; Jerry James Moses, Jr.; Anthony E. Newsom; Rance Olison; John Owens; Robert Pollard; Derrick Pope; Glenell Sanders; Thomas Sanders; Dwight A. Scales; Todd Scott; Frankie Smith; Jermaine Smith; Tyrone Smith; James A. Young, Sr.,

                                        Appellants (15-2273)

Scott Gilchrist, individually and on behalf of the Estate of Carlton Chester "Cookie" Gilchrist,
                                        Appellant (15-2290)

Jimmie H. Jones; Ricky Ray; Jesse Solomon,
                                        Appellants (15-2291)

2

Andrew Stewart,

                    Appellant (15-2292)

Willie T. Taylor,

                    Appellant (15-2294)

Alan Faneca; Roderick "Rock" Cartwright;
Jeff Rohrer; Sean Considine,

                    Appellants (15-2304)

James Mayberry,

                    Appellant (15-2305)

————————————

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action Nos. 2-12-md-02323 and 2-14-cv-00029)
District Judge: Honorable Anita B. Brody

————————————

Argued November 19, 2015

Before: AMBRO, HARDIMAN,
and NYGAARD, Circuit Judges

(Opinion filed: April 18, 2016)

TerriAnne Benedetto, Esquire
Seeger Weiss
1515 Market Street
Suite 1380
Philadelphia, PA   19102

David R. Buchanan, Esquire
Diogenes P. Kekatos, Esquire
Christopher A. Seeger, Esquire
Seeger Weiss LLP
77 Water Street, 26th Floor
New York, NY   10005

Samuel Issacharoff, Esquire    (Argued)
New York University Law School, Room 411J
40 Washington Square South
New York, NY   10012

Gene Locks, Esquire
David D. Langfitt, Esquire
Locks Law Firm
601 Walnut Street
The Curtis Center, Suite 720 East
Philadelphia, PA   19106

Dianne M. Nast, Esquire
NastLaw
1101 Market Street, Suite 2801
Philadelphia, PA  19107

Stephen F. Rosenthal, Esquire
Steven C. Marks, Esquire
Podhurst Orseck

25 West Flager Street, Suite 800
Miami, FL   33130

Arnold Levin, Esquire
Frederick S. Longer, Esquire
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA   19106

Brad S. Karp, Esquire
Theodore V. Wells, Jr., Esquire
Lynn B. Bayard, Esquire
Bruce A. Birenboim, Esquire
Walter R. Reiman, Esquire
Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
New York, NY   10019

Beth A. Wilkinson, Esq.
Wilkinson Walsh & Eskovitz
1900 M Street, N.W.
Suite 800
Washington, DC 20036

Paul D. Clement, Esquire    (Argued)
Andrew N. Ferguson, Esquire
David Zachary Hudson, Esquire
Robert M. Bernstein, Esquire
Bancroft PLLC
500 New Jersey Avenue, N.W.
Seventh Floor
Washington, DC   20001

Robert C. Heim, Esquire
Dechert
2929 Arch Street
18th Floor, Cira Centre
Philadelphia, PA   19104

Sol H. Weiss, Esquire
Anapol Schwartz
1710 Spruce Street
Philadelphia, PA  19103


Counsel for Appellees

Alan B. Morrison, Esquire
George Washington University
2000 H Street, N.W.
Washington, DC   20052

Scott L. Nelson, Esquire
Public Citizen Litigation Group
1600 20th Street, N.W.
Washington, DC   20009

Counsel for Amicus Appellant
Public Citizen Inc.

Shana De Caro, Esquire
Michael V. Kaplen, Esquire
De Caro & Kaplan
427 Bedford Road, Suite 360
Pleasantville, NY   10570

          Counsel for Amicus Curiae
          Brain Injury Association of America

Christopher A. Bandas, Esquire
Bandas Law Firm
500 North Shoreline, Suite 1020
Corpus Christi, TX   78401

Howard J. Bashman, Esquire    (Argued)
Suite G-22
2300 Computer Avenue
Willow Grove, PA   19090

Gary P. Lightman, Esquire
Glenn A. Manochi, Esquire
Lightman & Manochi
1520 Locust Street, 12th Floor
Philadelphia, PA   19102

          Counsel for Appellants
          Craig and Dawn Heimburger

Edward W. Cochran, Esquire
Cochran & Cochran
20030 Marchmont Road
Shaker Heights, OH   44122

John J. Pentz, Esquire
19 Widow Rites Lane
Sudbury, MA   01776

Counsel for Appellants
Cleo Miller; Judson Flint; Elmer Underwood; Vincent
Clark, Sr.; Ken Jones; Fred Smerlas; Jim Rourke; Lou
Piccone; James David Wilkins, II

George W. Cochran, Esquire
1385 Russell Drive
Streetsboro, OH   44241

Counsel for Appellant
Curtis L. Anderson

Joseph Darrell Palmer, Esquire
2244 Faraday Avenue, Suite 121
Carlsbad, CA   92008

Jan L. Westfall, Esquire
29896 Blue Water Way
Menifee, CA   92584

Counsel for Appellant
Darren R. Carrington

Richard L. Coffman, Esquire
The Coffman Law Firm
505 Orleans Street, Suite 505
Beaumont, TX   77701

Deepak Gupta, Esquire    (Argued)
Matthew W.H. Wessler, Esquire
Jonathan E. Taylor, Esquire
Gupta Wessler PLLC
1735 20th Street, N.W.
Washington, DC   20009

Mitchell A. Toups, Esquire
Weller Green Toups & Terrell
2615 Calder Street, Suite 400
Beaumont, TX   77704

Jason C. Webster, Esquire
The Webster Law Firm
6200 Savoy, Suite 640
Houston, TX   77036

      Counsel for Appellants
      Raymond Armstrong; Nathaniel Newton, Jr.; Larry
      Brown; Kenneth Davis; Michael McGruder; Clifton L.
      Odom; George Teague; Drew Coleman; Dennis
      DeVaughn; Alvin Harper; Ernest Jones; Michael
      Kiselak; Jeremy Loyd; Gary Wayne Lewis; Lorenzo
      Lynch; Hurles Scales, Jr.; Gregory Evans; David
      Mims; Evan Ogelsby; Phillip E. Epps; Charles L.
      Haley, Sr.; Kevin Rey Smith; Darryl Gerard Lewis;
      Curtis Bernard Wilson; Kelvin Mack Edwards, Sr.;
      Dwayne Levels; Solomon Page; Tim McKyer; Larry
      Barnes; James Garth Jax; William B. Duff; Mary
      Hughes; Barbara Scheer; Willie T. Taylor

Lance H. Lubel, Esquire
Adam Q. Voyles, Esquire
Lubel Voyles
5020 Montrose Boulevard, Suite 800
Houston, TX   77006

Mickey L. Washington, Esquire
1314 Texas Avenue, Suite 811
Houston, TX   77002

Charles L. Becker, Esquire    (Argued)
Kline & Specter
1525 Locust Street, 19th Floor
Philadelphia, PA  19102

Counsel for Appellants
Liyongo Patrise Alexander; Charlie Anderson; Charles E. Arbuckle;  Cassandra Bailey, as Representative of the Estate of Johnny Bailey; Ben Bronson; Curtis Ceaser, Jr.; Larry Centers; Darrell Colbert; Harry Colon; Christopher Crooms; Jerry W. Davis; Tim Denton; Michael Dumas; Corris Ervin; Doak Field; Baldwin Malcolm Frank; Derrick Frazier; Murray E. Garrett; Clyde P. Glosson; Roderick W. Harris; Wilmer K. Hicks, Jr.; Patrick Jackson; Gary Jones; Ryan McCoy; Jerry James Moses, Jr.; Anthony E. Newsom; Rance Olison; John Owens; Robert Pollard; Derrick Pope; Glenell Sanders: Thomas Sanders; Dwight A. Scales; Todd Scott; Frankie Smith; Jermaine Smith; Tyrone Smith; James A. Young, Sr.

Jared H. Beck, Esquire

Elizabeth Lee Beck, Esquire
Beck & Lee Trial Lawyers
Corporate Park at Kendall
12485 Southwest 137 Avenue, Suite 205
Miami, FL   33186

Antonino G. Hernandez, Esquire
4 Southeast 1st Street, 2nd Floor
Miami, FL   33131

Cullin A. O'Brien, Esquire   (Argued)
6541 Northeast 21st Way
Fort Lauderdale, FL   33308

Jeffrey J. Cairlanto, Esquire
Profy Promisloff & Ciarlanto
100 North 22nd Street
Unit 105
Philadelphia, PA   19103

  Counsel for Appellant
  Scott Gilchrist, individually and on behalf of the Estate
  of Carlton Chester "Cookie" Gilchrist

Dwight P. Bostwick, Esquire
Zuckerman Spaeder LLP
1800 M Street, N.W., Suite 1000
Washington, DC   20036

Cyril V. Smith, Esquire
Zuckerman Spaeder LLP
100 East Pratt Street, Suite 2440
Baltimore, MD   21202

11

Ramya Kasturi, Esquire
Zuckerman Spaeder LLP
399 Park Avenue, 14th Floor
New York, NY   10022

  Counsel for Appellants
  Jimmie H. Jones; Ricky Ray; Jesse Solomon

Stuart D. Lurie, Esquire
Rosenthal Lurie
102 Pickering Way
Suite 200
Exton, PA   19341

Michael H. Rosenthal, Esquire
Rosenthal Lurie
1500 John F. Kennedy Boulevard, Suite 1230
Philadelphia, PA   19102

  Counsel for Appellant
  Andrew Stewart

Steven F. Molo, Esquire    (Argued)
Thomas J. Wiegand, Esquire
Kaitlin R. O'Donnell, Esquire
MoloLamken LLP
540 Madison Avenue
New York, NY   10022

Eric R. Nitz, Esquire
Rayiner I. Hashem, Esquire
Jeffrey M. Klein, Esquire

MoloLamken LLP
The Watergate, Suite 660
600 New Hampshire Avenue, NW
Washington, DC   20037

William T. Hangley, Esquire
Michele D. Hangley, Esquire
Hangley Aronchick Segal Pudlin & Schiller
One Logan Square
18th & Cherry Streets, 27th Floor
Philadelphia, PA   19103

Linda S. Mullenix, Esquire
2305 Barton Creek Blvd, Unit 2
Austin, TX   78735

    Counsel for Appellants
    Alan Faneca; Roderick "Rock" Cartwright;
    Jeff Rohrer; Sean Considine

David S. Coale, Esquire
Edward J. Dennis, Esquire
Kent D. Krabill, Esquire
Lynn Tillotson Pinker and Cox
2100 Ross Avenue, Suite 2700
Dallas, TX   75201

    Counsel for Appellant
    James Mayberry

_____

OPINION OF THE COURT

_____

AMBRO, <u>Circuit Judge</u>

## **TABLE OF CONTENTS**

I.      INTRODUCTION ..........................................................15
II.     BACKGROUND ...........................................................15
   A.   Concussion Suits Are Brought Against the NFL ........... 15
   B.   The Parties Reach a Settlement................................... 19
   C.   The Proposed Settlement............................................ 20
      1.   Monetary Award Fund......................................... 21
      2.   Baseline Assessment Program................................ 23
      3.   Education Fund................................................... 23
      4.   The Proposed Class ............................................ 24
III.    JURISDICTION & STANDARD OF REVIEW...............25
IV.     CLASS CERTIFICATION.............................................26
   A.   Numerosity.............................................................. 27
   B.   Commonality............................................................ 27
   C.   Typicality ............................................................... 29
   D.   Adequacy of Representation ....................................... 31
      1.   Class Counsel .................................................... 31
      2.   Class Representatives .......................................... 35
      3.   Conflicts of Interest ............................................ 36
   E.   Predominance .......................................................... 42
   F.   Superiority .............................................................. 44
V.      CLASS NOTICE .........................................................44
VI.     CLASS SETTLEMENT .................................................46
   A.   Presumption of Fairness............................................ 47
   B.   *Girsh & Prudential* Factors...................................... 48
   C.   Settlement's Treatment of CTE................................... 56
VII.    ATTORNEYS' FEES......................................................63
   A.   Deferral of Fee Petition............................................ 63
   B.   Clear Sailing Provision.............................................. 68
VIII.   CONCLUSION ............................................................69

## I.   INTRODUCTION

The National Football League ("NFL") has agreed to resolve lawsuits brought by former players who alleged that the NFL failed to inform them of and protect them from the risks of concussions in football.  The District Court approved a class action settlement that covered over 20,000 retired players and released all concussion-related claims against the NFL.  Objectors have appealed that decision, arguing that class certification was improper and that the settlement was unfair.  But after thorough review, we conclude that the District Court was right to certify the class and approve the settlement.  Thus we affirm its decision in full.

## II.   BACKGROUND

### A.   Concussion Suits Are Brought Against the NFL

In July 2011, 73 former professional football players sued the NFL and Riddell, Inc. in the Superior Court of California.  Compl., *Maxwell v. Nat'l Football League*, No. BC465842 (Cal. Super. Ct. July 19, 2011).  The retired players alleged that the NFL failed to take reasonable actions to protect them from the chronic risks of head injuries in football.  The players also claimed that Riddell, a manufacturer of sports equipment, should be liable for the defective design of helmets.

The NFL removed the case to federal court on the ground that the players' claims under state law were preempted by federal labor law.  More lawsuits by retired players followed and the NFL moved under 28 U.S.C. § 1407

to consolidate the pending suits before a single judge for pretrial proceedings. In January 2012, the Judicial Panel on Multidistrict Litigation consolidated these cases before Judge Anita B. Brody in the Eastern District of Pennsylvania as a multidistrict litigation ("MDL"). *In re: Nat'l Football League Players' Concussion Injury Litig.*, 842 F. Supp. 2d 1378 (J.P.M.L. 2012). Since consolidation, 5,000 players have filed over 300 similar lawsuits against the NFL and Riddell.[1] Our appeal only concerns the claims against the NFL.

To manage the litigation, the District Court appointed co-lead class counsel, a Steering Committee, and an Executive Committee. The Steering Committee was charged with performing or delegating all necessary pretrial tasks and the smaller Executive Committee was responsible for the overall coordination of the proceedings. The Court also ordered plaintiffs to submit a Master Administrative Long-Form Complaint and a Master Administrative Class Action Complaint to supersede the numerous then-pending complaints.

The Master Complaints tracked many of the allegations from the first lawsuits. Football puts players at

---

[1] There is also a pending class action against the National Collegiate Athletic Association ("NCAA") over its handling of head injuries. In January 2016, the District Court overseeing the action preliminarily certified the class and approved a settlement subject to certain revisions. *In re: Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, No. 13-9116, 2016 WL 305380 (N.D. Ill. Jan. 26, 2016). Under the settlement, the NCAA will pay $70 million to create a medical monitoring fund to screen current and former collegiate athletes for brain trauma.

risk of repetitive brain trauma and injury because they suffer concussive and sub-concussive hits during the game and at practice (sub-concussive hits fall below the threshold for a concussion but are still associated with brain damage). Plaintiffs alleged that the NFL had a duty to provide players with rules and information to protect them from the health risks—both short and long-term—of brain injury, including Alzheimer's disease, dementia, depression, deficits in cognitive functioning, reduced processing speed, loss of memory, sleeplessness, mood swings, personality changes, and a recently identified degenerative disease called chronic traumatic encephalopathy (commonly referred to as "CTE").

Because CTE figures prominently in this appeal, some background on this condition is in order. It was first identified in 2002 based on analysis of the brain tissue of deceased NFL players, including Mike Webster, Terry Long, Andre Waters, and Justin Strzelczyk. CTE involves the build-up of "tau protein" in the brain, a result associated with repetitive head trauma. Medical personnel have examined approximately 200 brains with CTE as of 2015, in large part because it is only diagnosable post-mortem. That diagnosis requires examining sections of a person's brain under a microscope to see if abnormal tau proteins are present and, if so, whether they occur in the unique pattern associated with CTE. Plaintiffs alleged that CTE affects mood and behavior, causing headaches, aggression, depression, and an increased risk of suicide. They also stated that memory loss, dementia, loss of attention and concentration, and impairment of language are associated with CTE.

The theme of the allegations was that, despite the NFL's awareness of the risks of repetitive head trauma, the League ignored, minimized, or outright suppressed information concerning the link between that trauma and cognitive damage. For example, in 1994 the NFL created the

17

Mild Traumatic Brain Injury Committee to study the effects of head injuries. Per the plaintiffs, the Committee was at the forefront of a disinformation campaign that disseminated "junk science" denying the link between head injuries and cognitive disorders. Based on the allegations against the NFL, plaintiffs asserted claims for negligence, medical monitoring, fraudulent concealment, fraud, negligent misrepresentation, negligent hiring, negligent retention, wrongful death and survival, civil conspiracy, and loss of consortium.

After plaintiffs filed the Master Complaints, the NFL moved to dismiss, arguing that federal labor law preempted the state law claims. Indeed, § 301 of the Labor Management Relations Act preempts state law claims that are "substantially dependent" on the terms of a labor agreement. *Int'l Bhd. of Elec. Workers v. Hechler*, 481 U.S. 851, 852–53 (1987). The NFL claimed that resolution of plaintiffs' claims depended upon the interpretation of Collective Bargaining Agreements ("CBAs") in place between the retired players and the NFL.[2] If the CBAs do preempt plaintiffs' claims, they must arbitrate those claims per mandatory arbitration provisions in the CBAs. Plaintiffs responded that their

---

[2] After the NFL removed some of the early concussion-related lawsuits from state courts, several district courts accepted this preemption argument as a basis for denying requests to remand the cases. *See, e.g.*, *Smith v. Nat'l Football League Players Ass'n*, No. 14-1559, 2014 WL 6776306, at *9 (E.D. Mo. Dec. 2, 2014); *Duerson v. Nat'l Football League, Inc.*, No. 12-2513, 2012 WL 1658353, at *6 (N.D. Ill. May 11, 2012); *but see Green v. Arizona Cardinals Football Club LLC*, 21 F. Supp. 3d 1020, 1030 (E.D. Mo. 2014) (finding that concussion-related claims did not depend on interpretation of CBAs and granting motion to remand).

18

negligence and fraud claims would not require federal courts to interpret the CBAs and in any event the CBAs did not cover all retired players.

## B.      The Parties Reach a Settlement

On July 8, 2013, while the NFL's motion to dismiss was pending, the District Court ordered the parties to mediate and appointed a mediator.  On August 29, 2013, after two months of negotiations and more than twelve full days of formal mediation, the parties agreed to a settlement in principle and signed a term sheet.  It provided $765 million to fund medical exams and offer compensation for player injuries.  The proposed settlement would resolve the claims of all retired players against the NFL related to head injuries.

In January 2014, after more negotiations, class counsel filed in the District Court a class action complaint and sought preliminary class certification and preliminary approval of the settlement.  The Court denied the motion because it had doubts that the capped fund for paying claims would be sufficient.  *In re Nat'l Football League Players' Concussion Injury Litig.*, 961 F. Supp. 2d 708, 715 (E.D. Pa. 2014).  It appointed a Special Master to assist with making financial forecasts and, five months later, the parties reached a revised settlement that uncapped the fund for compensating retired players.

Class counsel filed a second motion for preliminary class certification and preliminary approval in June 2014. The District Court granted the motion, preliminarily approved the settlement, conditionally certified the class, approved classwide notice, and scheduled a final fairness hearing.  *In re Nat'l Football League Players' Concussion Injury Litig.*, 301 F.R.D. 191 (E.D. Pa. 2014).  Seven players petitioned for interlocutory review.  *See* Fed. R. Civ. P. 23(f) ("A court of

appeals may permit an appeal from an order granting or denying class-action certification under this rule if a petition for permission to appeal is filed with the circuit clerk within 14 days after the order is entered."). In September 2014, we denied the petition, later explaining over a dissent that we lacked jurisdiction because the District Court's order preliminarily certifying the class was not an "order granting or denying class-action certification." *In re Nat'l Football League Players' Concussion Injury Litig.*, 775 F.3d 570, 571–72 (3d Cir. 2014).

Following preliminary certification, potential class members had 90 days to object or opt out of the settlement. Class counsel then moved for final class certification and settlement approval. On November 19, 2014, the District Court held a day-long fairness hearing and heard argument from class counsel, the NFL, and several objectors who voiced concerns against the settlement. After the hearing, the Court proposed several changes to benefit class members. The parties agreed to the proposed changes and submitted an amended settlement in February 2015. On April 22, 2015, the Court granted the motion for class certification and final approval of the amended settlement, that grant explained in a 123-page opinion. *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351 (E.D. Pa. 2015). Objectors filed 12 separate appeals that were consolidated into this single appeal before us now.

### C.   The Proposed Settlement

The settlement has three components: (1) an uncapped Monetary Award Fund that provides compensation for retired players who submit proof of certain diagnoses; (2) a $75 million Baseline Assessment Program that provides eligible retired players with free baseline assessment examinations of their objective neurological functioning; and (3) a $10 million

20

Education Fund to instruct football players about injury prevention.

### 1. Monetary Award Fund

Under the settlement, retired players or their beneficiaries are compensated for developing one of several neurocognitive and neuromuscular impairments or "Qualifying Diagnoses." By "retired players," we mean players who retired from playing NFL football before the preliminary approval of the class settlement on July 7, 2014. The settlement recognizes six Qualifying Diagnoses: (1) Level 1.5 Neurocognitive Impairment; (2) Level 2 Neurocognitive Impairment;[3] (3) Alzheimer's Disease; (4) Parkinson's Disease; (5) Amyotrophic Lateral Sclerosis ("ALS"); and (6) Death with CTE provided the player died before final approval of the settlement on April 22, 2015. A retired player does not need to show that his time in the NFL caused the onset of the Qualifying Diagnosis.

A Qualifying Diagnosis entitles a retired player to a maximum monetary award:

| Qualifying Diagnosis | Maximum Award |
|---|---|
| Level 1.5 Neurocognitive Impairment | $1.5 Million |
| Level 2 Neurocognitive Impairment | $3 Million |
| Parkinson's Disease | $3.5 Million |

---

[3] Levels 1.5 and 2 Neurocognitive Impairment require a decline in cognitive function and a loss of functional capabilities, such as the ability to hold a job, and correspond with clinical definitions of mild and moderate dementia.

| Alzheimer's Disease | $3.5 Million |
|---|---|
| Death with CTE | $4 Million |
| ALS | $5 Million |

This award is subject to several offsets, that is, awards decrease: (1) as the age at which a retired player is diagnosed increases; (2) if the retired player played fewer than five eligible seasons; (3) if the player did not have a baseline assessment examination; and (4) if the player suffered a severe traumatic brain injury or stroke unrelated to NFL play.

To collect from the Fund, a class member must register with the claims administrator within 180 days of receiving notice that the settlement has been approved. This deadline can be excused for good cause. The class member then must submit a claims package to the administrator no later than two years after the date of the Qualifying Diagnosis or within two years after the supplemental notice is posted on the settlement website, whichever is later. This deadline can be excused for substantial hardship. The claims package must include a certification by the diagnosing physician and supporting medical records. The claims administrator will notify the class member within 60 days if he is entitled to an award. The class member, class counsel, and the NFL have the right to appeal an award determination. To do so, a class member must submit a $1,000 fee, which is refunded if the appeal is successful and can be waived for financial hardship. A fee is not required for the NFL and class counsel to appeal, though the NFL must act in good faith when appealing award determinations.

The Monetary Award Fund is uncapped and will remain in place for 65 years. Every retired player who timely registers and qualifies during the lifespan of the settlement will receive an award. If, after receiving an initial award, a

retired player receives a more serious Qualifying Diagnosis, he may receive a supplemental award.

### 2. *Baseline Assessment Program*

Any retired player who has played at least half of an eligible season can receive a baseline assessment examination. It consists of a neurological examination performed by credentialed and licensed physicians selected by a court-appointed administrator. Qualified providers may diagnose retired players with Level 1, 1.5, or 2 Neurocognitive Impairment. The results of the examinations can also be compared with any future tests to determine whether a retired player's cognitive abilities have deteriorated.

Baseline Assessment Program funds will also provide Baseline Assessment Program Supplemental Benefits. Retired players diagnosed with Level 1 Neurocognitive Impairment—evidencing some objective decline in cognitive function but not yet early dementia—are eligible to receive medical benefits, including further testing, treatment, counseling, and pharmaceutical coverage.

The Baseline Assessment Program lasts for 10 years. All retired players who seek and are eligible for a baseline assessment examination receive one notwithstanding the $75 million cap. Every eligible retired player age 43 or over must take a baseline assessment examination within two years of the Program's start-up. Every eligible retired player younger than age 43 must do so before the end of the program or by his 45th birthday, whichever comes first.

### 3. *Education Fund*

The Education Fund is a $10 million fund to promote safety and injury prevention in football. The purpose is to promote safety-related initiatives in youth football and educate retired players about their medical and disability benefits under the CBA. Class counsel and the NFL, with input from the retired players, will propose specific educational initiatives for the District Court's approval.

### 4. *The Proposed Class*

All living NFL football players who retired from playing professional football before July 7, 2014, as well as their representative claimants and derivative claimants, comprise the proposed class. Representative claimants are those duly authorized by law to assert the claims of deceased, legally incapacitated, or incompetent retired players. Derivative claimants are those, such as parents, spouses, or dependent children, who have some legal right to the income of retired players. Even though the proposed class consists of more than just retired players, we use the terms "class members" and "retired players" interchangeably.

The proposed class contains two subclasses based on a retired players' injuries as of the preliminary approval date. Subclass 1 consists of retired players who were not diagnosed with a Qualifying Diagnosis prior to July 7, 2014, and their representative and derivative claimants. Put another way, subclass 1 includes retired players who have no currently known injuries that would be compensated under the settlement. Subclass 2 consists of retired players who were diagnosed with a Qualifying Diagnosis prior to July 7, 2014, and their representative claimants and derivative claimants. Translated, subclass 2 includes retired players who are currently injured and will receive an immediate monetary award under the settlement. The NFL estimates that the total population of retired players is 21,070. Of this, 28% are

expected to be diagnosed with a compensable disease. The remaining 72% are not expected to develop a compensable disease during their lifetime.

Class members release all claims and actions against the NFL "arising out of, or relating to, head, brain and/or cognitive injury, as well as any injuries arising out of, or relating to, concussions and/or sub-concussive events," including claims relating to CTE. The releases do not compromise the benefits that retired players are entitled to receive under the CBAs, nor do they compromise their retirement benefits, disability benefits, and health insurance.

Of the over 20,000 estimated class members (the NFL states that the number exceeds 21,000), 234 initially asked to opt out from the settlement and 205 class members joined 83 written objections submitted to the District Court. Before the fairness hearing, 26 of the 234 opt-outs sought readmission to the class. After the District Court granted final approval, another 6 opt-outs sought readmission. This leaves 202 current opt-outs, of which class counsel notes only 169 were timely filed.

## III.    JURISDICTION & STANDARD OF REVIEW

The District Court had jurisdiction over this class action settlement under 28 U.S.C. § 1332(d)(2).[4] We have

---

[4] One objector argues that the District Court failed to determine whether it had subject matter jurisdiction over the class action because it never decided the NFL's motion to dismiss. But the NFL's motion to dismiss would have no effect on subject matter jurisdiction because the plaintiffs properly alleged jurisdiction based on the diversity of the parties and the amount in controversy. 28 U.S.C. §

appellate jurisdiction to review its final order approving the settlement and certifying the class under 28 U.S.C. § 1291.

We review the decision to certify a class and approve a classwide settlement for abuse of discretion. *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 185 n.1 (3d Cir. 2015); *In re Cendant Corp. Litig.*, 264 F.3d 201, 231 (3d Cir. 2001). It exists "if the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312 (3d Cir. 2008) (internal quotation omitted).

This appeal principally presents two questions— whether the District Court abused its discretion (1) in certifying the class of retired NFL players and (2) in concluding that the terms of the settlement were fair, reasonable, and adequate. Objectors (95 in all) have filed 11 separate briefs totaling some 500 pages addressing these questions. We address each of these arguments, but refer to objectors collectively throughout our opinion rather than cross-referencing particular objectors with particular arguments.

## IV. CLASS CERTIFICATION

Rule 23(a) lays out four threshold requirements for certification of a class action: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Fed. R. Civ. P. 23(a). "The parties seeking class certification bear the burden of establishing by a preponderance of the evidence that the requirements of Rule 23(a) have been met." *In re Cmty. Bank of N. Virginia*

1332(d)(2). There was thus no error in declining to decide the motion to dismiss.

26

*Mortg. Lending Practices Litig.*, 795 F.3d 380, 391 (3d Cir. 2015). If that occurs, we consider whether the class meets the requirements of one of three categories of class actions in Rule 23(b). This is a Rule 23(b)(3) class action under which we consider whether (1) common questions predominate over any questions affecting only individual class members (predominance) and (2) class resolution is superior to other available methods to decide the controversy (superiority). Fed. R. Civ. P. 23(b)(3).

### A. Numerosity

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There is no magic number of class members needed for a suit to proceed as a class action. We have set a rough guidepost in our precedents, however, and stated that numerosity is generally satisfied if there are more than 40 class members. *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 595 (3d Cir. 2012) (citing *Stewart v. Abraham,* 275 F.3d 220, 226–27 (3d Cir. 2001)). The District Court found that a class of 20,000 retired players would be sufficient for numerosity. *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 371. No objector challenges this finding on appeal.

### B. Commonality

"A putative class satisfies Rule 23(a)'s commonality requirement if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013) (internal quotation marks omitted). "Their claims must depend upon a common contention . . . that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the

validity of each of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2545 (2011). Meeting this requirement is easy enough: "[W]e have acknowledged commonality to be present even when not all members of the plaintiff class suffered an actual injury, when class members did not have identical claims, and, most dramatically, when some members' claims were arguably not even viable." *In re Cmty. Bank*, 795 F.3d at 397 (internal citations omitted).

The District Court concluded that "critical factual questions" were common to all class members, including "whether the NFL Parties knew and suppressed information about the risks of concussive hits, as well as causation questions about whether concussive hits increase the likelihood that [r]etired [p]layers will develop conditions that lead to Qualifying Diagnoses." *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 371. It also found common legal questions, including the "nature and extent of any duty owed to [r]etired [p]layers by the NFL Parties, and whether [labor] preemption, workers' compensation, or some affirmative defense would bar their claims." *Id.*

Some objectors argue that commonality was lacking. Citing the Supreme Court's decision in *Wal-Mart*, they contend that the retired players do not share common issues of fact or law because they were injured in different ways and over different periods of time. For example, the claims of a lineman who played fifteen seasons in the NFL, so goes the argument, will share little in common with those of a back-up quarterback who played two seasons.

These objections miss the mark. In *Wal-Mart*, the Supreme Court held that commonality was lacking when a putative class of 1.5 million female employees alleged sex discrimination by their local supervisors. 131 S. Ct. at 2547.

28

The local supervisors had discretion in making employment decisions and the class of female employees faced different managers making different employment decisions (some presumably nondiscriminatory). *Id.* The proposed class thus could not identify common questions capable of classwide resolution. *Id.* at 2553–55.

The concerns in *Wal-Mart* do not apply here because the NFL Parties allegedly injured retired players through the same course of conduct. *See In re Cmty. Bank*, 795 F.3d at 399 ("Unlike the *Wal-Mart* plaintiffs, the Plaintiffs in this case have alleged that the class was subjected to the same kind of illegal conduct by the same entities, and that class members were harmed in the same way, albeit to potentially different extents."). Even if players' particular injuries are unique, their negligence and fraud claims still depend on the same common questions regarding the NFL's conduct. For example, when did the NFL know about the risks of concussion? What did it do to protect players? Did the League conceal the risks of head injuries? These questions are common to the class and capable of classwide resolution.

## C.    Typicality

Rule 23(a)(3) requires that the class representatives' claims be "typical of the claims . . . of the class." Fed. R. Civ. P. 23(a)(3). This "ensures the interests of the class and the class representatives are aligned 'so that the latter will work to benefit the entire class through the pursuit of their own goals.'" *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 182–83 (3d Cir. 2001) (quoting *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 141 (3d Cir. 1998)). We also have set a "low threshold" for typicality. *Id.* at 183. "'Even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories' or where the claim arises

from the same practice or course of conduct." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 311 (3d Cir. 1998) (quoting *Baby Neal v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994)) (alteration omitted).

The class representatives, Shawn Wooden and Kevin Turner, were named in the class action complaint and were selected by class counsel.[5] Wooden is a retired player with no Qualifying Diagnosis. Like other retired players without a current diagnosis, he sought a baseline assessment examination to determine whether he had shown signs of cognitive decline and, in the unfortunate event that he developed one of the Qualifying Diagnoses, he would seek a monetary award. Turner was a retired player living with ALS.[6] Like other retired players with currently known injuries, he sought a monetary award. The District Court concluded that the claims of Wooden and Turner were "typical of those they represent." *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 372. We agree.

---

[5] In September 2013, one month after the parties signed the settlement term sheet, the initial subclass representative for players with no currently known injuries, Corey Swinson, passed away. One month later, Wooden took Swinson's place.

[6] We note that Kevin Turner passed away on March 24, 2016. Class counsel has moved to substitute as a party Turner's father, Paul Raymond Turner, a motion we will grant. *See* Fed. R. App. P. 43(a)(1). For purposes of deciding this appeal, it is unnecessary to substitute a new class member as subclass representative and we shall continue to refer to Kevin Turner as the subclass representative in this opinion.

Some objectors argue that the claims of the class representatives are not typical because of factual differences between the representatives and other class members, including the number of seasons played and injuries caused by head trauma. But class members need not "share identical claims," and "cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims." *Baby Neal*, 43 F.3d at 56, 58. What matters is that Wooden and Turner seek recovery under the same legal theories for the same wrongful conduct as the subclasses they represent. Even if the class representatives' injuries are unique to their time in football, the NFL's alleged fraudulent concealment of the risks of head injuries is the same.

## D.   Adequacy of Representation

Rule 23(a)(4) requires class representatives to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). It tests the qualifications of class counsel and the class representatives. It also aims to root out conflicts of interest within the class to ensure that all class members are fairly represented in the negotiations. Several objectors challenge the District Court's adequacy-of-representation finding, but we conclude that it was not an abuse of discretion.

### 1.   Class Counsel

When examining settlement classes, we "have emphasized the special need to assure that class counsel: (1) possessed adequate experience; (2) vigorously prosecuted the action; and (3) acted at arm's length from the defendant." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 801 (3d Cir. 1995) ("*GM Trucks*"). Rule

31

23(g) also sets out a non-exhaustive list of factors for courts to consider when appointing class counsel. They include counsel's work in the pending class action, experience in handling class actions or other complex litigation, knowledge of the applicable law, and the resources available for representing the class. Fed. R. Civ. P. 23(g).

When class counsel and the NFL began mediation, there was only one proposed class of all retired players. Class counsel, in consultation with members of the Steering Committee and the Executive Committee, decided early in the negotiations that creating two separate subclasses "would best serve all [c]lass [m]embers' interests and meet with Due Process." To that end, class counsel designated lawyers from the Steering Committee to serve as subclass counsel.

In its final certification and approval order, the District Court found that class counsel and subclass counsel were experienced in litigating mass torts and personal injury actions, vigorously prosecuted the action at arm's length from the NFL, and were able to extract substantial concessions in the process. *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 373. The Court thus concluded that class counsel adequately protected the interests of the class. *Id.* No objectors challenge the experience or qualifications of class and subclass counsel. They do make two related arguments regarding the adequacy of the subclass representation, though neither convinces us that the District Court abused its discretion.

Objectors first assert that the procedure for selecting subclass counsel did not ensure adequate representation because subclass counsel came from the team of lawyers already negotiating with the NFL. We agree that class counsel could have gone to the District Court and asked it to appoint counsel from the outside. Yet objectors point us to

32

no precedent requiring such a procedure. Moreover, the District Court assured itself that counsel were adequate representatives. They were selected early in the negotiations, had already been approved by the District Court to serve on the Steering Committee, and were by all accounts active participants in the settlement negotiations. In these circumstances, the District Court did not abuse its discretion in accepting subclass counsel as adequate representatives.

Objectors next press that the subclass counsel for future claimants, Arnold Levin, was not an adequate representative, as he represented nine players who alleged current symptoms in two lawsuits against the NFL. Levin disclosed to the District Court in an application for the Steering Committee that he has agreed to fees in these cases on a one-third contingency basis. Objectors argue to us that Levin's representation of these players created a conflict with his duties to represent the subclass of retired players with no Qualifying Diagnoses. Yet objectors failed to raise this contention in the District Court and did not meaningfully assert it on appeal until their reply brief.[7] If they had raised concerns over Levin's representation of other players, we have no doubt the District Court could ably have addressed this argument. This is part of the reason why we do not normally consider arguments not raised in the District Court—even in class actions—and deem them waived. *In re*

---

[7] Alongside the reply brief, objectors also filed a motion asking that we take judicial notice of complaints filed by retired players where Levin was counsel of record. The motion for judicial notice is unnecessary. The complaints were part of the MDL proceeding and were accessible on the MDL docket. Even if not in the joint appendix, they are part of the record on appeal. *See* Fed. R. App. P. 10 (record on appeal includes papers filed in the District Court).

33

*Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 261 (3d Cir. 2009) ("'Absent exceptional circumstances, this Court will not consider issues raised for the first time on appeal.'" (quoting *Del. Nation v. Pennsylvania*, 446 F.3d 410, 416 (3d Cir. 2006)).

That said, some courts have relaxed the standards for waiver in class actions. *See, e.g.*, *In re Sw. Airlines Voucher Litig.*, 799 F.3d 701, 714 (7th Cir. 2015) ("Class members were not obliged, on penalty of waiver, to search on their own for a conflict of interest on the part of a class representative."). We agree that the usual waiver rules should not be applied mechanically in class actions. We have an independent obligation to protect the interests of the class, and in many instances class members are far removed from the litigation and lack the information and incentive to object. *See GM Trucks*, 55 F.3d at 784 ("[T]he court plays the important role of protector of the absentees' interests, in a sort of fiduciary capacity, by approving appropriate representative plaintiffs and class counsel."). Accordingly, we retain discretion to consider arguments that go to the heart of the class settlement's adequacy and fairness. Out of caution, we decline to apply the penalty of waiver in this instance.

Turning to the merits, we do not see how representation by Levin created a conflict of interest. He disclosed his representation of the players to the District Court, and it was still satisfied that he was an adequate representative. Beyond this, there is no evidence in the record before us that the players named in the complaints have a current Qualifying Diagnosis. Rather, they simply allege current symptoms that are not themselves Qualifying Diagnoses, including memory loss, headaches, mood swings, and sensitivity to light. Many players without a current Qualifying Diagnosis presumably have similar symptoms.

34

Accordingly, this is not a situation where subclass counsel has clients in both subclasses and there is a risk of a conflict.

### 2. *Class Representatives*

A class representative must represent a class capably and diligently. "[A] minimal degree of knowledge" about the litigation is adequate. *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007) (internal quotation marks omitted). The District Court found that the class representatives ably discharged their duties by closely following the litigation, authorizing the filing of the Class Action Complaint, and approving the final settlement. *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 375.

Some objectors argue that the Court abused its discretion in approving Wooden as representative for the subclass of players with no Qualifying Diagnoses because he did not claim the risk of developing CTE. This is incorrect. In the Class Action Complaint Wooden alleged that he is "at increased risk of latent brain injuries caused by . . . repeated traumatic head impacts." *Id.* (citing Master Administrative Class Action Complaint ¶ 7). This allegation covers the risk of CTE, which is associated with repeated head impacts. Moreover, what matters more than the words Wooden used to describe his current health are the interests he would have in representing the subclass. Given what we know about CTE, Wooden, and all retired NFL players for that matter, are at risk of developing the disease and would have an interest in compensation for CTE in the settlement.[8]

---

[8] Objectors also argue in passing that the other subclass representative, Turner, failed to allege a risk of CTE. This

### 3. *Conflicts of Interest*

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). The "linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183 (3d Cir. 2012). But not all intra-class conflicts are created equal. If they concern "specific issues in controversy," they are called "fundamental." *Id.* at 184 (quoting *Newberg on Class Actions* § 3:26 (4th ed. 2002)). This hits the heart of Rule 23(a)(4) and will defeat a finding of adequacy. *Id.*

A recurring fundamental conflict is the divide between present and future injury plaintiffs identified in *Amchem*. Counsel in that case sought to approve a class settlement and certify a nationwide class of persons—numbering between 250,000 and 2,000,000—who shared an unfortunate fact in common: they were all exposed to asbestos-containing products manufactured by 20 companies. *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 617 (3d Cir. 1996), *aff'd sub nom. Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997). The class settlement purported to resolve the claims of persons who had already sustained injuries as a result of asbestos exposure (those with present injuries) and those who had been exposed to asbestos but had not yet developed any injury (those with future injuries, if any injury at all). The District Court approved the settlement and certified the class, but we reversed because, among other things, conflicts of interest within the class precluded a finding of adequacy.

argument fails for the same reason that it failed with respect to Wooden—all players are at risk of CTE.

36

Judge Becker explained that the "most salient" conflict of interest was between those with present and future injuries:

> As rational actors, those who are not yet injured would want reduced current payouts (through caps on compensation awards and limits on the number of claims that can be paid each year). The futures plaintiffs should also be interested in protection against inflation, in not having preset limits on how many cases can be handled, and in limiting the ability of defendant companies to exit the settlement. Moreover, in terms of the structure of the alternative dispute resolution mechanism established by the settlement, they should desire causation provisions that can keep pace with changing science and medicine, rather than freezing in place the science of 1993. Finally, because of the difficulty in forecasting what their futures hold, they would probably desire a delayed opt out . . . .
>
> In contrast, those who are currently injured would rationally want to maximize current payouts. Furthermore, currently injured plaintiffs would care little about inflation-protection. The delayed opt out desired by futures plaintiffs would also be of little interest to the presently injured; indeed, their interests are against such an opt out as the more people locked into the settlement, the more likely it is to survive. In sum, presently injured class representatives cannot adequately represent the futures plaintiffs' interests and vice versa.

*Id.* at 630–31 (internal footnote omitted). The Supreme Court affirmed on this point and agreed that "the interests of those within the single class are not aligned." *Amchem*, 521 U.S. at 626.

To overcome a conflict of interest within a proposed class, there must be "structural protections to assure that differently situated plaintiffs negotiate for their own unique interests." *Georgine*, 83 F.3d at 631. A common structural protection is the creation of discrete subclasses, each with its own independent representation. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999) ("[A] class divided between holders of present and future claims . . . requires division into homogenous subclasses . . . with separate representation to eliminate conflicting interests of counsel.").[9]

The District Court found no fundamental conflict of interest in this class. *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 376. It explained the incentives of class members were aligned because they "allegedly were injured by the same scheme: the NFL . . . negligently and fraudulently de-emphasized the medical effects of concussions to keep [r]etired [p]layers in games." *Id.* Moreover, the two subclasses of players guarded against any *Amchem* conflict of interest. *Id.* Turner, the

---

[9] Amicus Public Citizen, Inc. argues that the District Court should have created additional subclasses to represent each of the five Qualifying Diagnoses, the mood and behavior symptoms associated with CTE, and spouses of retired players with consortium claims. We agree with the District Court that additional subclasses were unnecessary and risked slowing or even halting the settlement negotiations. *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 379.

representative for those with current injuries, "is interested in immediately obtaining the greatest possible compensation for his injuries and symptoms." *Id.* Wooden, the representative for those who may develop injuries that manifest in the future, "is interested in monitoring his symptoms, guaranteeing that generous compensation will be available far into the future, and ensuring an agreement that keeps pace with scientific advances . . . [while] compensat[ing] as many conditions as possible." *Id.* The District Court also cited other structural protections, including uncapped and inflation-adjusted monetary awards, the guarantee of a baseline assessment examination, and the presence of a mediator and special master. *Id.* at 376–77.

The Court's analysis was on point. Some objectors argue that this class action suffers from a conflict of interest between present and future injury plaintiffs. But simply put, this case is not *Amchem*. The most important distinction is that class counsel here took *Amchem* into account by using the subclass structure to protect the sometimes divergent interests of the retired players. The subclasses were represented in the negotiations by separate class representatives with separate counsel, and, as discussed, each was an adequate representative. This alone is a significant structural protection for the class that weighs in favor of finding adequacy.

Moreover, the terms of the settlement reflect that the interests of current and future claimants were represented in the negotiations. The Monetary Award Fund will start paying out claims immediately, providing relief to those currently living with injuries. The Fund is uncapped and inflation-adjusted, protecting the interests of those who worry about developing injuries in the future. The NFL and class counsel must meet every ten years and confer in good faith about "prospective modifications to the definitions of Qualifying

Diagnoses and/or the protocols for making Qualifying Diagnoses, in light of generally accepted advances in medical science." This allows the settlement to keep pace with changing science regarding the existing Qualifying Diagnoses. As observed in *Georgine*, these are the sorts of settlement terms that rational actors from both subclasses would be interested in when negotiating the resolution of their claims.

Finally, one of the principal concerns driving *Amchem*'s strict analysis of adequacy of representation was the worry that persons with a nebulous risk of developing injuries would have little or no reason to protect their rights and interests in the settlement. We have evidence that in this case the concern is misplaced because many retired players with no currently compensable injuries have already taken significant steps to protect their rights and interests. Of the 5,000 players who sued the NFL in the MDL proceedings, class counsel estimated that 3,900 have no current Qualifying Diagnosis. These 3,900 players are represented, in turn, by approximately 300 lawyers. And with so many sets of eyes reviewing the terms of the settlement, the overwhelming majority of retired players elected to stay in the class and benefit from the settlement. We thus have little problem saying that their interests were adequately represented.

Objectors further claim that the settlement's treatment of CTE demonstrates a fundamental conflict of interest between present and future injury class members. Under the settlement, retired players who died before final approval of the settlement and received a post-mortem CTE diagnosis are entitled to an award. For any player who died after final approval, a post-mortem CTE diagnosis is not compensable. Objectors cite this difference in recovery as evidence that the subclass of players with a Qualifying Diagnosis may have bargained away the CTE claims of other players. *GM Trucks*,

40

55 F.3d at 797 ("[A] settlement that offers considerably more value to one class of plaintiffs than to another may be trading the claims of the latter group away in order to enrich the former group.").

This argument misunderstands the role of the monetary award for CTE. As the District Court noted in discussing the fairness of the settlement, the monetary award "serves as a proxy for Qualifying Diagnoses deceased [r]etired [p]layers *could* have received while living." *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 401–02 (emphasis in original). Retired players who were living with symptoms associated with one of the other Qualifying Diagnoses, but died before approval of the settlement, may not have had sufficient notice of the need to be diagnosed. To provide some compensation to these players, the parties created an award for the post-mortem diagnosis of CTE. The NFL's own estimate is that 46 players out of a class exceeding at least 20,000 will fall into this category and will receive an average award, after offsets, of $1,910,000. The monetary award for CTE is thus an attempt to compensate deceased players who would otherwise be unable to get the benefits available to the class going forward. It is not evidence of a debilitating conflict of interest in the class settlement.[10]

---

[10] Some objectors claim that the District Court erred in denying their motion to intervene in May 2014. In the class-action context, potential interveners must overcome a presumption of adequate representation and "must ordinarily demonstrate adversity of interest, collusion, or nonfeasance on the part of a party to the suit." *In re Cmty. Bank of N. Virginia*, 418 F.3d 277, 315 (3d Cir. 2005). Objectors have not overcome the presumption in this case because, as just

41

### E.    Predominance

Turning to the additional requirements for certifying a class action under Rule 23(b)(3), the class may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members."    Fed. R. Civ. P. 23(b)(3). Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623.  "We have previously noted that the Rule 23(b)(3) predominance requirement, which is far more demanding, incorporates the Rule 23(a) commonality requirement."  *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2004) (citing *In re LifeUSA Holding, Inc.*, 242 F.3d 136, 144 (3d Cir. 2001)).  We are nonetheless "more inclined to find the predominance test met in the settlement context."  *Sullivan v. DB Investments, Inc.*, 667 F.3d 272, 304 n.29 (3d Cir. 2011) (en banc) (internal quotation marks and alteration omitted).

The District Court found that this class action presented predominate factual questions regarding the NFL's knowledge and conduct as well as common scientific questions regarding causation.  *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 380–81.  The negligence claims "depend on establishing that the NFL . . . knew of the dangers of concussive hits, yet failed to modify the rules of NFL Football to mitigate them, or even to warn [r]etired [p]layers that they were risking serious cognitive injury by continuing to play."  *Id.* at 380.  The fraud claims "suggest a similarly far-reaching scheme, alleging that the . . . MTBI Committee repeatedly obfuscated the link between

explained, the class representatives and class counsel were adequate.

football play and head trauma." *Id.* We agree with the District Court that predominance is satisfied in this case.

Objectors argue that damage claims in a mass-tort class action such as this are too individualized to satisfy the requirements of predominance. They cite to *Amchem* where, as we have discussed, a nationwide class of persons exposed to asbestos could not meet the predominance requirement. 521 U.S. at 624. But *Amchem* itself warned that it does not mean that a mass tort case will never clear the hurdle of predominance. *Id.* at 625 ("Even mass tort cases arising from a common cause or disaster may, depending upon the circumstances, satisfy the predominance requirement."). Moreover, this class of retired NFL players does not present the same obstacles for predominance as the *Amchem* class of hundreds of thousands (maybe millions) of persons exposed to asbestos.

### F.    Superiority

Rule 23(b)(3)'s superiority requirement "asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *Warfarin*, 391 F.3d at 533–34 (internal quotation marks omitted).  We consider the class members' interests in individually controlling litigation, the extent and nature of any litigation, the desirability or undesirability of concentrating the litigation, and the likely difficulties in managing a class action.  Fed. R. Civ. P. 23(b)(3)(A)–(D).  The District Court found superiority satisfied because "the [s]ettlement avoids thousands of duplicative lawsuits and enables fast processing of a multitude of claims." *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 382.

No objectors challenge this conclusion, and we have no disagreements with the District Court's analysis.  At the time the settlement was reached, 5,000 players had filed over 300 lawsuits in the MDL.  Assuming the retired players' claims survived the NFL's motions to dismiss, the resolution of so many individual lawsuits would have presented serious challenges for the District Court.  Given our experience with similar MDLs, we expect the proceedings would result in years of costly litigation and multiple appeals, all the while delaying any potential recovery for retired players coping with serious health challenges.

## V.    CLASS NOTICE

When the District Court preliminarily certified the class and approved the settlement in July 2014, it directed that notice be given to all potential class members.  Notice "is designed to summarize the litigation and the settlement and to apprise class members of the right and opportunity to inspect

44

the complete settlement documents, papers, and pleadings filed in the litigation." *Prudential*, 148 F.3d at 327 (internal quotation marks omitted). "Generally speaking, the notice should contain sufficient information to enable class members to make informed decisions on whether they should take steps to protect their rights, including objecting to the settlement or, when relevant, opting out of the class." *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 180 (3d Cir. 2013).

In our case, the notice informed retired players that a settlement was reached and explained what relief the players might be eligible for. The notice also outlined the rights of players to object to the settlement and potentially opt out. If a retired player chose to opt out, he would not benefit from the settlement but would not release his claims against the NFL. Approximately 1% of retired players filed objections to the settlement and another 1% elected to opt out.[11]

For a class certified under Rule 23(b)(3), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed R. Civ. P. 23(c)(2)(B). In addition to the requirements of Rule 23, due process further requires that notice be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

---

[11] Some argue that the District Court abused its discretion in striking as untimely certain objections to the settlement. But these actions were within the Court's broad discretion to manage the proceedings in a class action. *Hydrogen Peroxide*, 552 F.3d at 310.

The District Court found that the content of the class notice and its distribution to the class satisfied Rule 23 and due process. *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 383. One objector argues that the notice materials were inadequate because they insufficiently disclosed that monetary awards for players are subject to reduction on account of applicable Medicare and Medicaid liens against a player's assets. But the Long-Form Notice did discuss possible reductions based on "[a]ny legally enforceable liens on the award." *Id.* at 384 n.43 (internal quotation marks omitted). The Court found this language sufficient because the notice alerts class members to the possibility of lien reduction and refers them to the settlement where this topic is discussed in detail. *Id.* We agree.

## VI.  CLASS SETTLEMENT

A class action cannot be settled without court approval based on a determination that the proposed settlement is fair, reasonable, and adequate. Fed. R. Civ. P. 23(e)(2). The inquiry into the settlement's fairness under Rule 23(e) "protects unnamed class members from unjust or unfair settlements affecting their rights when the representatives become fainthearted before the action is adjudicated or are able to secure satisfaction of their individual claims by a compromise." *Amchem*, 521 U.S. at 623 (internal quotation marks omitted).

"The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." *Prudential*, 148 F.3d at 299 (internal quotation marks omitted). It "bear[s] the important responsibility of protecting absent class members, 'which is executed by the court's assuring that the settlement represents adequate compensation for the release of the class claims.'" *In re Pet Food Prods.*, 629 F.3d 333, 349 (3d Cir. 2010)

(quoting *GM Trucks*, 55 F.3d at 805). In cases of settlement classes, where district courts are certifying a class and approving a settlement in tandem, they should be "even 'more scrupulous than usual' when examining the fairness of the proposed settlement." *Warfarin*, 391 F.3d at 534 (quoting *GM Trucks*, 55 F.3d at 805).

### A.      Presumption of Fairness

We apply an initial presumption of fairness in reviewing a class settlement when: "(1) the negotiations occurred at arms length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *Cendant*, 264 F.3d at 232 n.18. The District Court found each of these elements satisfied and applied the presumption. *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 387–88. Objectors argue that the presumption should not have applied at all because class counsel did not conduct formal discovery into the fraud and negligence claims against the NFL before reaching the settlement. We conclude that the Court did not abuse its discretion in finding class counsel's informal discovery to be sufficient.

By the time of the settlement, class counsel had undertaken significant informal discovery. For instance, they had obtained a comprehensive database of the claims and symptoms of retired players and had enlisted the assistance of medical experts. They also had a grasp of the legal hurdles that the retired players would need to clear in order to succeed on their fraud and negligence claims, in particular the potentially dispositive issue of federal labor law preemption. Thus, in negotiations with the NFL class counsel "were aware of the strengths and weaknesses of their case." *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 387. To the extent objectors ask us to require

formal discovery before presuming that a settlement is fair, we decline the invitation. In some cases, informal discovery will be enough for class counsel to assess the value of the class' claims and negotiate a settlement that provides fair compensation. *See In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 267 (E.D. Pa. 2012) (applying presumption in part because, "although no formal discovery was conducted . . . , [class counsel] conducted informal discovery, including, *inter alia*, independently investigating the merits").

## B. *Girsh & Prudential* Factors

In *Girsh v. Jepson*, we noted nine factors to be considered when determining the fairness of a proposed settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

521 F.2d 153, 157 (3d Cir. 1975) (internal quotation marks and ellipses omitted). "The settling parties bear the burden of proving that the *Girsh* factors weigh in favor of approval of the settlement." *In re Pet Food Prods.*, 629 F.3d at 350. A

48

district court's findings under the *Girsh* test are those of fact. Unless clearly erroneous, they are upheld. *Id.*

Later, in *Prudential Insurance* we held that, because of a "sea-change in the nature of class actions," it might be useful to expand the *Girsh* factors to include several permissive and non-exhaustive factors:

> [1] the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; [2] the existence and probable outcome of claims by other classes and subclasses; [3] the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; [4] whether class or subclass members are accorded the right to opt out of the settlement; [5] whether any provisions for attorneys' fees are reasonable; and [6] whether the procedure for processing individual claims under the settlement is fair and reasonable.

148 F.3d at 323. "Unlike the *Girsh* factors, each of which the district court must consider before approving a class settlement, the *Prudential* considerations are just that, prudential." *In re Baby Prods.*, 708 F.3d at 174.

The District Court in our case went through the *Girsh* factors and the relevant *Prudential* factors in great detail before concluding that the terms of the settlement were fair,

reasonable, and adequate. *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 388–96. Objectors try to challenge the District Court's analysis in several ways, but none convinces us.

### 1. Complexity, Expense, and Likely Duration of the Litigation

"The first factor 'captures the probable costs, in both time and money, of continued litigation.'" *Warfarin*, 391 F.3d at 535–36 (quoting *Cendant*, 264 F.3d at 233). The District Court concluded that the probable costs of continued litigation in the MDL were significant and that this factor weighed in favor of approving the settlement. *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 388–89. Some objectors assert that the District Court overestimated the costs of continued litigation because the negligence and fraud claims were "straightforward." This is not the case. Over 5,000 retired NFL players in the MDL alleged a multi-decade fraud by the NFL, and litigating these claims would have been an enormous undertaking. The discovery needed to prove the NFL's fraudulent concealment of the risks of concussions was extensive. The District Court would then resolve many issues of causation and medical science. Finally, if the cases did not settle or were not dismissed, individual suits would be remanded to district courts throughout the country for trial. We agree with the District Court that the expense of this process weighs strongly in the settlement's favor.

### 2. Reaction of the Class to the Settlement

"The second *Girsh* factor 'attempts to gauge whether members of the class support the settlement.'" *Warfarin*, 391 F.3d at 536 (quoting *Prudential*, 148 F.3d at 318). As noted, the case began with a class of approximately 20,000 retired

50

players, of which 5,000 are currently represented by counsel in the MDL proceedings. Notice of the settlement reached an estimated 90% of those players through direct mail and secondary publications (in addition to the extensive national media coverage of this case). As of 10 days before the fairness hearing, more than 5,200 class members had signed up to receive additional information about the settlement and the settlement website had more than 64,000 unique visitors. With all this attention, only approximately 1% of class members objected and approximately 1% of class members opted out. We agree with the District Court that these figures weigh in favor of settlement approval. *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 389.

Some note that the percentage of objectors was even lower in *GM Trucks*, a case where we declined to approve a settlement. There, "[o]f approximately 5.7 million class members, 6,450 owners objected and 5,203 opted out." *GM Trucks*, 55 F.3d at 813 n.32. But in *GM* we looked past the low objection rate because there were "other indications that the class reaction to the suit was quite negative," including our concern that the passive victims of a product defect lacked "adequate interest and information to voice objections." *Id.* at 813. Those concerns are not present here. By the time of the settlement, many of the retired players in this class already had counsel and had sued the NFL, suggesting that their claims were valuable enough to pursue in court and that the players were informed enough to evaluate the settlement.[12]

---

[12] Others argue that we cannot rely on the reaction of the class because the class notice was "problematic." They claim that the notice may have misled class members about compensation for those with a post-mortem CTE diagnosis.

### 3. Stage of the Proceedings and Amount of Discovery Completed

"The third *Girsh* factor 'captures the degree of case development that class counsel [had] accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating.'" *Warfarin*, 391 F.3d at 537 (quoting *Cendant*, 264 F.3d at 235).

The District Court concluded that class counsel adequately evaluated the merits of the preemption and causation issues through informal discovery, and, after ten months of settlement negotiations, the stage of the proceedings weighed in favor of settlement approval. *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 390. Objectors claim that the lack of formal discovery in this matter should have weighed more heavily against settlement. As with the presumption of fairness, formal discovery is not a requirement for the third *Girsh* factor. What matters is not the amount or type of discovery class counsel pursued, but whether they had developed enough information about the case to appreciate sufficiently the value of the claims. Moreover, requiring parties to conduct formal discovery before reaching a proposed class settlement would take a valuable bargaining chip—the costs of formal discovery itself—off the table during negotiations. This could deter the early settlement of disputes.

### 4. Risks of Establishing Liability and Damages

But the District Court explained that the class notice was clear that only some cases of CTE would be compensated. *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 383–84.

"The fourth and fifth *Girsh* factors survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." *Prudential*, 148 F.3d at 319. We concur with the District Court that this factor weighed in favor of settlement because class members "face[d] stiff challenges surmounting the issues of preemption and causation." *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 391.

To start, if the NFL were to prevail in its motion to dismiss on the issue of federal labor law preemption, "many, if not all," of the class members' claims would be dismissed. *Id.* Objectors claim the District Court misjudged the risks of establishing liability and damages on this front. They argue that the NFL's preemption defense would not apply to all class members because there were no CBAs in effect before 1968 and between 1987 and 1993. But even if there were a small subset of players unaffected by the preemption defense, the defense still had the capability of denying relief to the majority of class members and this weighs in favor of approving the settlement.

As for causation, the District Court noted that retired players would need to show both general causation (that repetitive head trauma is capable of causing ALS, Alzheimer's, and the like), and specific causation (that the brain trauma suffered by a particular player in fact caused his specific impairments). *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 393. With general causation, the Court found that even though "[a] consensus is emerging that repetitive mild brain injury is associated with the Qualifying Diagnoses," the "available research is not nearly robust enough to discount the risks" of litigation. *Id.* And specific causation would be even more troublesome because a player would need to distinguish the effect of hits

53

he took during his NFL career from the effect of those he received in high school football, college football, or other contact sports. Objectors argue that the District Court put too little faith in the ability of the class to show causation because the NFL has admitted that concussions can lead to long-term problems and formal discovery could disclose that it fraudulently concealed the risks of concussions. But neither of these points is particularly helpful for overcoming the general and specific causation hurdles the District Court identified.

### 5. Risks of Maintaining Class Action Through Trial

The District Court found that the likelihood of obtaining and keeping a class certification if the action were to proceed to trial weighed in favor of approving the settlement, but it deserved only minimal consideration. *Id.* at 394. This was correct. In a settlement class, this factor becomes essentially "toothless" because "'a district court need not inquire whether the case, if tried, would present intractable management problems[,] . . . for the proposal is that there be no trial.'" *Prudential*, 148 F.3d at 321 (quoting *Amchem*, 521 U.S. at 620).

### 6. Ability of Defendants to Withstand a Greater Judgment

The seventh *Girsh* factor is most relevant when the defendant's professed inability to pay is used to justify the amount of the settlement. In the case of the NFL, the District Court found this factor neutral because the NFL did not cite potential financial instability as justification for the settlement's size. *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 394. In fact, it agreed

54

to uncap the Monetary Award Fund and is thus duty bound to pay every compensable claim.

Some objectors complain that the settlement, which may cost the NFL $1 billion over its lifetime, represents a "fraction of one year's revenues." Even so, that does not change the analysis of this *Girsh* factor. Indeed, "'in any class action against a large corporation, the defendant entity is likely to be able to withstand a more substantial judgment, and, against the weight of the remaining factors, this fact alone does not undermine the reasonableness of the . . . settlement.'" *Sullivan*, 667 F.3d at 323 (quoting *Weber v. Gov't Empl. Ins. Co.*, 262 F.R.D. 431, 447 (D.N.J. 2009)).

> 7. *Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and All Attendant Risks of Litigation*

In evaluating the eighth and ninth *Girsh* factors, we ask "whether the settlement represents a good value for a weak case or a poor value for a strong case." *Warfarin*, 391 F.3d at 538. "The factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." *Id.* "[T]he present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement." *Prudential*, 148 F.3d at 322 (quotation omitted).

If the retired players were successful in their fraud and negligence claims, they would likely be entitled to substantial damages awards. But we must take seriously the litigation risks inherent in pressing forward with the case. The NFL's pending motion to dismiss and other available affirmative

55

defenses could have left retired players to pursue claims in arbitration or with no recovery at all. Hence we agree with the District Court that the settlement represents a fair deal for the class when compared with a risk-adjusted estimate of the value of plaintiffs' claims. *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 395.

Objectors claim that the District Court should have taken into account the costs to class members of the registration and claims administration process because they decrease the "real value" for the class. But these costs are not relevant to the eighth and ninth *Girsh* factors. And in any event the Court assured itself that the claims process was "reasonable in light of the substantial monetary awards . . . and imposes no more requirements than necessary." *Id.* at 396.[13]

### 8. Prudential *Factors*

The District Court found that the relevant *Prudential* factors also weighed in favor of approving the settlement. *Id.* at 395–96. No objectors engage with the Court's findings on this front. But briefly, we agree that class counsel was able to assess the probable outcome of this case, class members had the opportunity to opt out, and the claims process is reasonable. The provision of attorneys' fees was a neutral factor because class counsel has not yet moved for a fee award.

### C. Settlement's Treatment of CTE

---

[13] The argument that the settlement's failure to compensate CTE makes it a poor value for the class we discuss separately below.

56

Objectors raise other arguments about the fairness of the settlement that do not necessarily fall neatly within one of the *Girsh* factors. The most common of those arguments is that the exclusion of CTE as a Qualifying Diagnosis for future claimants is unfair. Objectors note that CTE, the "industrial disease of football," was at the center of the first concussion lawsuits and argue that claims for CTE compensation are released by the settlement in return for nothing. The District Court carefully considered this argument before deciding that the settlement's treatment of CTE was reasonable. It made detailed factual findings about the state of medical science regarding CTE—findings that we review for clear error—in support of this conclusion.

The Court first determined that "[t]he study of CTE is nascent, and the symptoms of the disease, if any, are unknown." *Id.* at 397. Surveying the available medical literature, it found that researchers have not "reliably determined which events make a person more likely to develop CTE" and "have not determined what symptoms individuals with CTE typically suffer from while they are alive." *Id.* at 398. At the time of the Court's decision, only about 200 brains with CTE had been examined, and the only way currently to diagnose CTE is a post-mortem examination of the subject's brain. *Id.*

Citing studies by Dr. Ann McKee and Dr. Robert Stern, objectors argued that CTE progresses in four stages. In Stages I and II, the disease affects mood and behavior while leaving a retired player's cognitive functions largely intact. Headaches, aggression, depression, explosive outbursts, and suicidal thoughts are common. Later in life, as a retired player progresses to Stages III and IV, severe memory loss, dementia, loss of attention and concentration, and impairment of language begin to occur. The District Court explained, however, that these studies suffer from several limitations and

57

cannot generate "[p]redictive, generalizable conclusions" about CTE. *Id.* at 399. The studies suffered from a selection bias because they only examined patients with a history of repetitive head injury. They had to rely on reports by family members to reconstruct the symptoms patients showed before death. And they did not take into account other potential risk factors for developing CTE, including a high Body Mass Index ("BMI"), lifestyle change, age, chronic pain, or substance abuse. *Id.* at 398–99.

With this science in mind, the Court next determined that certain symptoms associated with CTE, such as memory loss, executive dysfunction, and difficulty with concentration, are compensated by the existing Qualifying Diagnoses. *Id.* And many persons diagnosed with CTE after death suffered from conditions in life that are compensated, including ALS, Alzheimer's disease, and Parkinson's disease. Relying on expert evidence, the Court estimated that "at least 89% of the former NFL players" who were examined in CTE studies would have been compensated under the settlement. *Id.*

To be sure, the mood and behavioral symptoms associated with CTE (aggression, depression, and suicidal thoughts) are not compensated, but this result was reasonable. Mood and behavioral symptoms are common in the general population and have multifactor causation and many other risk factors. *Id.* at 401. Retired players tend to have many of these risk factors, such as sleep apnea, a history of drug and alcohol abuse, a high BMI, chronic pain, and major lifestyle changes. *Id.* Class members would thus "face more difficulty proving that NFL Football caused these mood and behavioral symptoms than they would proving that it caused other symptoms associated with Qualifying Diagnoses." *Id.*

The District Court also reviewed the monetary award for post-mortem diagnoses of CTE. It found "[s]ound

58

reasons" for limiting the award to players who died before final approval of the settlement. *Id.* As we have summarized elsewhere, this compensation for deceased players is a proxy for Qualifying Diagnoses a retired player could have received while living. After final approval, players "should be well aware of the [s]ettlement and the need to obtain Qualifying Diagnoses," and "there no longer is a need for Death with CTE to serve as a proxy for Qualifying Diagnoses." *Id.* at 402.

Finally, the Court addressed the potential development of scientific and medical knowledge of CTE. Objectors argued that the settlement's treatment of CTE was unreasonable in light of the expected developments in CTE research. But even if a diagnosis of CTE during life will be available in the next five or ten years, "the longitudinal epidemiological studies necessary to build a robust clinical profile will still take a considerable amount of time." *Id.* The Court also noted that the settlement has some mechanism for keeping pace with science, in that the parties must meet and confer every ten years in good faith about possible modifications to the definitions of Qualifying Diagnoses. *Id.* at 403

Objectors have not shown any of the District Court's findings to be clearly erroneous, which exists when, "although there is evidence to support [the finding], the reviewing court, based on the entire evidence, concludes with firm conviction that a mistake has been made." *GM Trucks*, 55 F.3d at 783. Objectors argue that the Court overlooked certain expert evidence, but the record does not support this contention. They also complain that it failed to weigh the credibility of the different experts when the objectors' experts were not paid for their services. We do not see how the Court could have made a proper credibility determination on the basis of written declarations alone, and, in any event, we have

never required those determinations when considering the fairness of a settlement.

Others claim that the expert evidence on CTE should have been analyzed under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), which established threshold standards for the admissibility of expert scientific testimony at trial. Objectors failed to present this argument to the District Court, and we deem it waived. *In re Ins. Brokerage*, 579 F.3d at 261. Moreover, we have never held that district courts considering the fairness of a class action settlement should consider the admissibility of expert evidence under *Daubert*. And at least one court of appeals has rejected the argument objectors are making because, "[i]n a fairness hearing, the judge does not resolve the parties' factual disputes but merely ensures that the disputes are real and that the settlement fairly and reasonably resolves the parties' differences." *Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 636–37 (6th Cir. 2007).

Finding no clear errors in the District Court's findings on CTE, we are also convinced that the Court was well within its discretion in concluding that the settlement's treatment of this condition was reasonable. Most importantly, objectors are not correct when they assert that CTE claims are released by the settlement in return for "nothing." A primary purpose of the settlement is to provide insurance for living players who develop certain neurocognitive or neuromuscular impairments linked to repetitive head trauma (in addition to the benefits provided by the Baseline Assessment Program). Given what we know about CTE, many of the symptoms associated with the disease will be covered by this insurance. And compensation for players who are coping with these symptoms now is surely preferable to waiting until they die to pay their estates for a CTE diagnosis. Moreover, we agree

60

with the District Court that it would be an uphill battle to compensate for the mood and behavioral symptoms thought to be associated with CTE.

Before concluding, we address developments during the pendency of this appeal. In a March 2016 roundtable discussion on concussions organized by the House Energy & Commerce Subcommittee on Oversight & Investigations, the NFL's Executive Vice President cited the research of Dr. McKee and agreed that there was a link between football and degenerative brain disorders like CTE. The NFL's statement is an important development because it is the first time, as far as we can tell, that the NFL has publicly acknowledged a connection between football and CTE. On the other hand, the NFL is now conceding something already known. The sheer number of deceased players with a post-mortem diagnosis of CTE supports the unavoidable conclusion that there is a relationship, if not a causal connection, between a life in football and CTE.

Objectors cite the NFL's concession as further evidence that this settlement should be rejected. They argue that the NFL has now admitted there is a link between football and CTE, yet refused to compensate the disease. Again, we note that the settlement does compensate many of the impairments associated with CTE, though it does not compensate CTE as a diagnosis (with the exception of players who died before final approval of the settlement). Moreover, even if the NFL has finally come around to the view that there is a link between CTE and football, many more questions must be answered before we could say that the failure to compensate the diagnosis was unreasonable. For example, we still cannot reliably determine the prevalence, symptoms, or risk factors of CTE. The NFL's recent acknowledgment may very well advance the public discussion of the risks of contact sports, but it did not advance

61

the science. Accordingly, the NFL's statement is not a ground for reversal of the settlement's approval.

In the end, this settlement was the bargain struck by the parties, negotiating amid the fog of litigation. If we were drawing up a settlement ourselves, we may want different terms or more compensation for a certain condition. But our role as judges is to review the settlement reached by the parties for its fairness, adequacy, and reasonableness. And when exercising that role, we must "guard against demanding too large a settlement based on [our] view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." *GM Trucks*, 55 F.3d at 806. This settlement will provide significant and immediate relief to retired players living with the lasting scars of a NFL career, including those suffering from some of the symptoms associated with CTE. We must hesitate before rejecting that bargain based on an unsupported hope that sending the parties back to the negotiating table would lead to a better deal. Accordingly, we conclude that the settlement's treatment of CTE does not render the agreement fundamentally unfair.[14]

---

[14] We address a few remaining objections to the District Court's fairness inquiry. Some claim that the offsets in the settlement that reduce a player's monetary award were unreasonable. The Court explained why each offset had scientific support and we are content to say that objectors have not shown its findings to be clearly in error or its conclusions an abuse of discretion. *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 407–11. Others argue that the settlement should have used the definition of "eligible season" set forth in the NFL retirement plan. We concur with the District Court that the definition of

## VII. ATTORNEYS' FEES

Class counsel and the NFL did not negotiate the issue of fees until after the initial term sheet was signed. After negotiations, the NFL agreed not to contest any award of attorneys' fees and costs up to $112.5 million. Any fee award will be separate from the NFL's obligations under the settlement to pay monetary awards to the retired players. Class counsel may also petition the District Court to set aside 5% of each monetary award to administer the settlement. The petition for a fee award will be submitted to the Court at a later date. Objectors will then be able to present arguments as to why the requested award is improper, and the Court will have discretion to modify the award in whatever way it sees fit. Even though the issue of attorneys' fees remains undecided, some object that the settlement's treatment of fees is a reason for reversal.

### A. Deferral of Fee Petition

Objectors first argue that the District Court abused its discretion in approving the procedure for attorneys' fees. As noted, class counsel will request a fee award after the class action is certified and the class settlement is approved. Objectors claim that the "attorney-fee-deferral procedure" violated Federal Rule of Civil Procedure Rule 23(h) and deprived class members of due process. We note at the outset that objectors failed to present most of the elements of this argument to the Court at the final fairness hearing. The closest anyone came was when amicus Public Citizen, Inc. claimed that the absence of a fee petition "prevents a complete evaluation of the fairness of the settlement at this point." In response, the Court noted that interested parties

eligible season in the settlement was reasonable because it is a proxy for the number of head injuries. *Id*. at 410.

63

would have an opportunity to object to the fee petition when filed and that the separation of settlement approval from fee approval was an "accepted approach." *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 396.

As discussed elsewhere, the standards for waiver may be relaxed somewhat in the class action context because we have an independent obligation to protect the rights of absent class members. Applying this principle, we will reach the objections concerning attorneys' fees because, if the objections are persuasive, class members were denied a meaningful chance to object or opt out from the settlement. Our review, however, confirms that the procedure for awarding fees in this settlement was neither an unlawful procedure nor an obstacle to approval. We have no doubt that, at the specified time, class counsel's fee petition will be subject to careful review by the District Court and objectors will present challenges to the fee petition if warranted.

To start, the practice of deferring consideration of a fee award is not so irregular. We have seen the same arrangement in the settlement of a products liability class action related to diet drugs. *In re Diet Drugs Prods. Liab. Litig.*, 582 F.3d 524, 534–35 (3d Cir. 2009) (settlement approved in 2002, interim and final fee awards approved in 2009). Other courts have also used the same procedure. *E.g.*, *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico*, 910 F. Supp. 2d 891, 918 (E.D. La. 2012), *aff'd sub nom. In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014); *see also Newberg on Class Actions* § 14:5 (5th ed.) ("In some situations, the court will give final approval to a class action settlement and leave fees and costs for a later determination.").

Moreover, the separation of a fee award from final approval of the settlement does not violate Rule 23(h), which

allows a court to award reasonable attorneys' fees and costs in a certified class action subject to certain requirements. Nowhere does the provision require that class counsel move for its fee award at the same time that it moves for final approval of the settlement. Under the Rule, a fee petition must be made by motion served on all parties and, when the motion is made by class counsel, notice must be "directed to class members in a reasonable manner." Fed. R. Civ. P. 23(h)(1). Class members may then object and the court may hold a hearing. Fed. R. Civ. P. 23(h)(2)–(3). And the court "must find the facts and state its legal conclusions" and "may refer issues related to the amount of the award to a special master." Fed. R. Civ. P. 23(h)(3)–(4). So long as these conditions are met, the procedure for awarding attorneys' fees that the District Court approved in this case will not run afoul of subsection (h).

Objectors point us to the Advisory Committee Notes to Rule 23, which seem to contemplate combining class notice of the fee petition with notice of the terms of the settlement. Fed. R. Civ. P. 23(h)(1), 2003 advisory committee's note ("For motions by class counsel in cases subject to court review of a proposed settlement under Rule 23(e), it would be important to require the filing of at least the initial motion in time for inclusion of information about the motion in the notice to the class about the proposed settlement that is required by Rule 23(e).") & ("In cases in which settlement approval is contemplated under Rule 23(e), notice of class counsel's fee motion should be combined with notice of the proposed settlement, and the provision regarding notice to the class is parallel to the requirements for notice under Rule 23(e)."); *see also Newberg on Class Actions* § 8.24 (5th ed.) (Rule 23 envisions "linking together settlement notice and objections with fee notices and objections"). But even if we were willing to read the Advisory Committee's suggestion that fee petitions be filed alongside the settlement as a

65

requirement, "it is the Rule itself, not the Advisory Committee's description of it, that governs." *Dukes*, 131 S. Ct. at 2559.

Objectors also cite as support two cases from other circuits that found a violation of Rule 23(h). *See Redman v. RadioShack Corp.*, 768 F.3d 622, 638 (7th Cir. 2014), *cert. denied sub nom. Nicaj v. Shoe Carnival, Inc.*, 135 S. Ct. 1429 (2015); *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 993 (9th Cir. 2010). They are not, however, as helpful as objectors might think. In those cases, the district courts denied class members the opportunity to object to the particulars of counsel's fee request because counsel were not required to file a fee petition until after the deadline for class members to object expired. By the time they were served with notice of the fee petition, it was too late for them to object. We have little trouble agreeing that Rule 23(h) is violated in those circumstances. But in our case the fee petition has not yet been filed, the District Court has not set a deadline for objections to the fee petition, and the issue of whether class members will have an opportunity to object is hypothetical. Accordingly, we decline to hold that Rule 23(h) mandates the simultaneous notice of a class action settlement and notice of the fee petition.

The final argument raised by objectors on this point is that the decision to delay ruling on the fee award deprived class members of due process. As we discussed in evaluating classwide notice, constitutional due process requires that notice be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 314. Put another way, the notice of a class settlement "should contain sufficient information to enable class members to make informed decisions on whether they should take steps." *In re Baby Prods.*, 708 F.3d at 180.

The class notice here was sufficient to comply with due process. The notice advised that the NFL would pay attorneys' fees from a separate fund and not object to an award up to $112.5 million and that the District Court would consider fees after final approval and afford retired players an opportunity to object. From this, class members knew from where the fees for class counsel were coming (a separate fund), what the NFL's position on fees would be (no objection up to $112.5 million), and could ballpark the size of class counsel's eventual fee request (a betting person would say it will be close to $112.5 million). Even if the class members were missing certain information—for example, the number of hours class counsel worked and the terms of any contingency fee arrangements class counsel have with particular retired players—they still had enough information to make an informed decision about whether to object to or opt out from the settlement.

To be sure, we are sympathetic to concerns that others have raised over the practice of delaying consideration of a fee motion. As one treatise put it,

> [a] primary concern about class action settlements is that unmonitored class counsel may have incentives to sell out the class's interests in return for a large fee. To assess whether such a sell-out has occurred, class members need information *both* about the content of the settlement *and* about the scope of the fee. In this sense, fee notice not only may accompany settlement notice; it likely *should* accompany settlement notice.

*Newberg on Class Actions* § 8:22 (5th ed.) (emphases in original). Delaying the fee petition denies class members information about what their counsel did in negotiating the

67

settlement. And, all else being equal, the more information available the better. Moreover, class members may have less incentive to object to the fee award at a later time because approval of the settlement will have already occurred. But the procedure is not necessarily a violation of Rule 23(h), and in this instance it did not violate due process.

## B. Clear Sailing Provision

Objectors next challenge the provision in the settlement agreement that the NFL would not object to a fee award up to $112.5 million. This is often referred to as a "clear sailing provision" (probably because the implication is that the fee request stands a much better chance of court approval if the defendant is not objecting). The concern with a clear sailing provision is collusion. The defendant is indifferent to the allocation of its liability between the class and counsel; all that matters is the total liability. To forgo the opportunity to object to the fee award, the defendant will presumably want something in return because it is giving up the chance to reduce its overall liability. We thus might fear that class counsel has given away something of value to the class in return for the defendant's agreement not to contest a fee request below a certain level.

Despite these concerns, "numerous cases . . . have approved agreements containing such clear-sailing clauses." *In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 138 (E.D. La. 2013). We join our sister circuits in declining to hold that clear sailing provisions are *per se* bars to settlement approval while nonetheless emphasizing that they deserve careful scrutiny in any class action settlement. *See In re Sw. Airlines Voucher Litig.*, 799 F.3d 701, 712 (7th Cir. 2015); *Gooch v. Life Inv'rs Ins. Co. of Am.*, 672 F.3d 402, 426 (6th Cir. 2012); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 949 (9th Cir. 2011); *Blessing v.*

68

*Sirius XM Radio Inc.*, 507 F. App'x 1, 4 (2d Cir. 2012); *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 525 (1st Cir. 1991). A district court faced with such a provision in a class action settlement should review the process and substance of the settlement and satisfy itself that the agreement does not indicate collusion or otherwise pose a problem.

The District Court here found the clear sailing provision unobjectionable. It emphasized that the issue of fees was not discussed until after the principal terms of the settlement were agreed to, the fee award will not diminish class recovery, and the agreed amount is just over 10% of the estimated class recovery. *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. at 374–75. We discern no abuse of discretion. There is simply no evidence in the negotiation process or the final terms of the settlement that class counsel bargained away the claims of retired players in return for their own fees.

## VIII. CONCLUSION

It is the nature of a settlement that some will be dissatisfied with the ultimate result. Our case is no different, and we do not doubt that objectors are well-intentioned in making thoughtful arguments against certification of the class and approval of this settlement. They aim to ensure that the claims of retired players are not given up in exchange for anything less than a generous settlement agreement negotiated by very able representatives. But they risk making

the perfect the enemy of the good. This settlement will provide nearly $1 billion in value to the class of retired players. It is a testament to the players, researchers, and advocates who have worked to expose the true human costs of a sport so many love. Though not perfect, it is fair.

In sum, we affirm because we are satisfied that the District Court ably exercised its discretion in certifying the class and approving the settlement.