**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-2753
_____

IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS'
CONCUSSION INJURY LITIGATION

AMON GORDON,
                    Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-12-md-02323)
District Judge: Honorable Anita B. Brody
_____

Submitted Under Third Circuit L.A.R. 34.1(a):
June 22, 2021

Before: GREENAWAY, JR., PORTER, and ROTH,
*Circuit Judges*

(Opinion filed: November 24, 2021)
_____

OPINION[*]
_____

---

[*] This disposition is not an opinion of the full Court and, under I.O.P. 5.7, is not binding precedent.

PORTER, *Circuit Judge*.

Amon Gordon, a retired National Football League ("NFL") linebacker, seeks a monetary award through the NFL's concussion-settlement program. Gordon submitted a claim through the settlement program, but his claim was denied. He appealed the denial to the District Court, arguing that the Special Master who denied his claim misinterpreted the settlement agreement. The District Court affirmed the Special Master's interpretation, and Gordon now appeals to this Court. However, in his briefing, Gordon abandons his interpretive argument and instead argues that the District Court failed to adequately explain its reasoning and the factual background of his claim. Gordon's present argument fails because the District Court fully analyzed and explained the interpretive question that Gordon raised. The court's failure to discuss background factual issues is irrelevant because those issues were never presented to the court. We will therefore affirm.

I

A

This case arises out of the class-action settlement resolving retired NFL players' claims that the NFL "failed to inform them of and protect them from the risks of concussions in football." *In re Nat'l Football League Players Concussion Inj. Litig.* (*NFL I*), 821 F.3d 410, 420 (3d Cir. 2016).[1] In 2015, after years of negotiation, the NFL and the

---

[1] Since the settlement, we have heard several appeals regarding issues in the administration of the settlement. *See In re Nat'l Football League Players' Concussion Inj. Litig.* (*NFL II*), 923 F.3d 96 (3d Cir. 2019); *In re Nat'l Football League Players' Concussion Inj. Litig.* (*NFL III*), 814 F. App'x 678 (3d Cir. 2020); *In re Nat'l Football League Players' Concussion Inj. Litig.* (*NFL IV*), 962 F.3d 94 (3d Cir. 2020); *In re Nat'l*

former players reached a final agreement that was subsequently approved by the District Court. *Id.* at 423. On appeal, we affirmed the District Court's approval of the agreement, *id.* at 448, and it became effective on January 7, 2017.

After the effective date, all former players seeking a diagnosis were required to go through the same Baseline Assessment Program with physicians who were preapproved by the NFL. But the agreement established a different set of requirements for former players who had already received diagnoses from their personal physicians prior to the effective date. Critical to this appeal, even though the agreement established a different avenue for former players with pre-effective-date diagnoses, the agreement explained that *all* diagnoses were still required to be "based on evaluation and evidence generally consistent with" the diagnostic criteria used in the Baseline Assessment Program. App. 798. To ensure that pre-effective-date diagnoses are "generally consistent" with the Program's diagnostic criteria, the agreement requires that all pre-effective-date diagnoses be reviewed by an advisory panel of approved physicians.

After the panel makes its determination, former players and the NFL have the right to appeal the decision to the District Court. The District Court may refer appeals to a "Special Master," who may reverse the panel "upon a showing by the appellant of clear and convincing evidence." App. 702, 743, 866. In the event of such referral, either party may appeal the Special Master's decision to the District Court, but the settlement agreement limits the court's review. The factual determinations of the Special Master are

_____

*Football League Players' Concussion Inj. Litig.* (*NFL V*), 826 F. App'x 136 (3d Cir. 2020).

3

"final and binding," and the District Court's review is limited to questions of law. App. 866.

B

The settlement agreement enables retired players to receive monetary relief if they can show that they have a "Qualifying Diagnosis." App. 734–36. Such diagnoses include: (1) Early Dementia, (2) Moderate Dementia, (3) Alzheimer's disease, (4) Parkinson's disease, and (5) amyotrophic lateral sclerosis ("ALS").

Early Dementia, the subject of this appeal, can be particularly difficult to quantify. The Baseline Assessment Program diagnoses Early Dementia using five cognitive "domains." App. 798. The Program includes a battery of tests spread across the five domains to estimate the degree of functional and cognitive impairment in an individual case. But before the tests can determine whether a former player has concussion-induced Early Dementia, the testing physicians must first estimate the player's pre-injury intellectual functioning. For the pre-injury baselines, the Baseline Assessment Program classifies each former player into one of three categories: "Below Average," "Average," or "Above Average." App. 806. The Above Average category includes all players who had an estimated pre-injury IQ above 110.

The examining physician then assesses the player's current scores on a variety of tests in each domain. If an individual score is far enough below what is expected for a person with the same pre-injury baseline, the physician can infer that the player is suffering from some sort of cognitive decline in that area. Impairment is based on the *degree* of cognitive decline, not a raw score.

4

After the raw scores are compiled, the Baseline Assessment Program requires that the scores be converted into T-scores[2] to determine if the scores are enough standard deviations below the expected range to indicate statistical significance. For a domain to be considered "impaired," a former player must have two scores in that domain that fall below the standard-deviation threshold. App. 807–10. And to receive an Early Dementia diagnosis, the former player must be impaired in two or more domains.

C

In 2017, Gordon submitted a claim for a monetary award because, two years prior to the settlement, his personal physicians diagnosed him with Early Dementia. Because Gordon received the diagnosis before the effective date, the diagnosis had to be reviewed by the advisory panel. The panel approved Gordon's claim and concluded that his pre-effective-date diagnosis was generally consistent with the diagnostic criteria in the Baseline Assessment Program. But after the panel had already issued its approval, a neuropsychology consultant reviewed the application and recommended that the claim be denied because Gordon's personal physicians did not properly scale Gordon's scores.

---

[2] In his briefing, Gordon suggests that this T-score requirement is, in effect, requiring "race-norming" and the unequal treatment of black players. Appellant's Br. 29–33. The NFL responds that the T-score requirement has nothing to do with norming and that it is purely a statistical convention: "Scaled scores and T scores merely use different numerical scales, thus the conversion of scaled to T scores is strictly mathematical and linear (a scaled score is a mean of 10 and a standard deviation of 3, while a T score is a mean of 50 and a standard deviation of 10)." Appellees' Br. 23. However, that issue is not before us on appeal. As Gordon's own reply brief makes clear, this appeal is not about race-norming: "[Gordon] raised the question of race norming as a possible explanation for what transpired below, but specifically did NOT ask this Court to consider that issue because the evidence is not before it." Reply Br. 3 n.1.

Gordon's claim was also flagged for an audit. After the audit, the panel again approved Gordon's claim and concluded that Gordon's pre-effective-date diagnosis met the Baseline Assessment Program criteria. In response, the NFL appealed to the Special Master.

The parties agreed that Gordon belonged in the Above Average pre-injury baseline. They also agreed that Gordon's personal physicians used many of the same tests that were part of the Baseline Assessment Program. But the NFL claimed that Gordon's personal physicians used improper "scaled scores" rather than the T-scores required by the settlement, which skewed the results. App. 938. The NFL argued that when the scores were properly converted to T-scores, Gordon failed to meet the Program's criteria for an Early Dementia diagnosis. The Special Master agreed with the NFL, concluding that the diagnosis from Gordon's personal physicians was not "generally consistent" with the diagnostic standards in the settlement agreement. App. 1095. Further, the Special Master concluded that Gordon's test scores did not show the cognitive decline required for a diagnosis, so he denied Gordon's claim.

D

Gordon appealed the Special Master's decision to the District Court. Because the District Court's jurisdiction is limited to legal issues, Gordon's appeal was confined to a single question: whether the Special Master erroneously required Gordon's pre-effective-date diagnosis to be "generally consistent" with the diagnostic standards listed in the settlement's Baseline Assessment Program. App. 949. In a well-reasoned and detailed opinion, the District Court sided with the Special Master's interpretation. The court

6

explained that, under the settlement, "[a]ll Qualifying Diagnoses must be made . . . consistent with Exhibit 1," and Exhibit 1 unequivocally states that "Retired NFL Football Players **diagnosed outside of the** [Baseline Assessment Program]" must be diagnosed "based on evaluation and evidence **generally consistent** with the [Baseline Assessment Program] diagnostic criteria." App. 2–3 (bold text in original). Thus, the District Court concluded that "[t]he terms of the Settlement Agreement plainly state that the 'generally consistent' standard applies to all Qualifying Diagnoses of [Early and Moderate Dementia], including pre–Effective Date diagnoses." App. 2.

## E

Gordon timely appealed. However, he now completely abandons his argument presented to the District Court. He concedes that all pre-effective-date diagnoses must be "generally consistent" with the diagnostic criteria in the settlement's Baseline Assessment Program. Appellant's Br. 6. He repeated this concession in his reply brief, stating: "Plaintiff-Appellant withdrew any objection he had over the question of whether a pre-effective date claim must be generally consistent with the other claim determinations set forth in the Settlement Agreement, and never raised this issue again after he raised it before Judge Brody and it was clarified." Reply Br. 3 n.1. Instead, Gordon now claims that the District Court abused its discretion by failing to explain its reasoning for upholding the Special Master's determination. Gordon presses no other arguments.

## II

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1332, and

7

"retained jurisdiction over the administration of the Settlement Agreement." *NFL IV*, 962 F.3d at 101. We have jurisdiction under 28 U.S.C. § 1291. We review the District Court's interpretation of the settlement agreement for clear error and its administration of the settlement for abuse of discretion. *NFL IV*, 962 F.3d at 101.

## III

Gordon made only one argument to the District Court: that his claim was not required to be generally consistent with the Baseline Assessment Program. Rather than press that argument here, Gordon now asks us to vacate and remand so the court "can explain its reasoning." Reply Br. 1. Gordon claims that the court's analysis was an abuse of discretion because he "cannot discern the factual basis for the District Court's denial of his award." Reply Br. 2.

Gordon's argument is meritless. The court cogently resolved the only question before it: whether the diagnosis supporting Gordon's claim had to be generally consistent with the standards in the Baseline Assessment Program. Although Gordon claims that the court should have given a more detailed account of the factual underpinnings of his claim, those issues were not before the court and were not germane to its disposition of Gordon's legal objection. The District Court gave a well-reasoned and detailed analysis of the issue Gordon raised. Thus, we discern no abuse of discretion.

## IV

Accordingly, we will affirm the District Court's order.